# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
September 28, 2010 Session

## STATE OF TENNESSEE v. TRAVIS KINTE ECHOLS

**Direct Appeal from the Criminal Court for Knox County**
**No. 82476      Bob R. McGee, Judge**

---

**No. E2009-01697-CCA-R3-CD - Filed June 14, 2011**

---

A Knox County Criminal Court jury convicted the appellant, Travis Kinte Echols, of first degree felony murder committed during the perpetration of robbery, and the trial court sentenced him to life. On appeal, the appellant raises numerous issues, including that the evidence is insufficient to support the conviction. Finding no errors that warrant reversal, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Robert L. Jolley, Jr., Knoxville, Tennessee, for the appellant, Travis Kinte Echols.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Philip Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

This case relates to the shooting death of Robert Steely on June 18, 2005, in Knoxville. Darlene Thomas, the victim's daughter, testified that in June 2005, the victim was sixty-seven years old, a widower, and dealt in antique cars. The victim owned guns and always carried a gun on his person. Thomas said the victim did not have a bank account, carried large amounts of money with him, and "might have seven or eight thousand dollars on him at one time." The victim did not have a criminal record. He told his daughter he had a girlfriend, but he never allowed his daughter to meet her. On the day the victim was killed,

Thomas went to the hospital, but the victim was dead when she got there. Thomas never saw or received the victim's wallet after his death.

On cross-examination, Thomas testified that she did not know Patricia Hickman but found some of Hickman's belongings, including part of a drug pipe, at the victim's home after his death. She denied the victim had a drug problem. She said that although the victim did not have a permit to carry a gun, he carried a gun in his pocket or in his car if he was driving. Although Thomas never received the appellant's wallet after his death, the police gave her two rings and a watch he had been wearing when he was killed.

Officer Gerald Smith of the Knoxville Police Department testified that on June 18, 2005, he responded to a shooting call at Town View Towers apartments, parking lot C, and arrived at the scene about 4:05 p.m. Another officer was present, and emergency medical technicians (EMTs) were working on the victim. The victim was sitting behind the steering wheel of a red and white 1958 Buick Special and was slumped to the left. Officer Smith said the Buick "straddled" two parking spaces. A white Ford Escort was parked in the parking space to the left of the Buick, and a white Oldsmobile Cutlass was parked in the space to the left of the Escort. All of the cars were facing the building that contained apartments 506 through 516.

Officer Smith testified that the Buick's door windows were down and that the car was in reverse gear. The key was in the ignition, but the ignition was turned off. Officer Smith removed a Titan Tiger .38 Special revolver from underneath the victim's left arm, and blood was on the gun. The six-shot revolver was loaded with six rounds, and one round had been fired. When the EMTs took the victim out of the car, Officer Smith saw that the victim had a gunshot wound to his left chest. Officers patted down the victim, looking for identification, but did not find a wallet.

Officer Smith testified that the police found one spent .22 caliber cartridge case on the pavement behind the Escort and one spent .22 caliber cartridge case behind the Cutlass. He saw a bullet mark inside the Buick across the driver's seat-back and a bullet hole in the car's passenger-side door. Using a metal rod, officers tracked the path of the bullet and determined that it had been fired from outside the car, struck the seat-back behind the victim, traveled across the inside of the car, and entered the passenger-side door. Officer Smith also saw a bullet hole behind the passenger door of the Escort. The hole was larger than the hole in the Buick's passenger door, meaning it had been created by a larger caliber bullet. The bullet entered the Escort, struck the rear stereo speaker on the passenger side, and came to rest inside the car's rear window area. After Officer Smith left the scene, he went to the emergency room and learned the victim was dead.

On cross-examination, Officer Smith testified that he swabbed the victim's hands at the emergency room to test for contact with DNA. Officer Smith left the emergency room, went to the victim's home, and photographed and fingerprinted a crack pipe found there. The police also found female clothing, a purse, and a hairbrush.

Officer Jan Gangware of the Knoxville Police Department testified that she went to the crime scene to help Officer Smith and used a metal rod to mark the trajectory of the bullet that entered the Buick and struck the passenger-side door. Officer Gangware removed the panel from the door and collected the bullet. She later processed the victim's car for fingerprints at the city impound lot. She lifted fingerprints from the car and a soda can inside the car and turned them over to a fingerprint expert. She also swabbed the car to test for DNA.

Dan Crenshaw of the Knoxville Police Department testified that he worked in the forensic unit and examined the fingerprints lifted from the Buick. The victim's fingerprints were on the car's trunk and driver-side right fender. Rebecca Carpenter's fingerprints were on the soda can and the window frame of the passenger-side door.

Patricia M. Resig, a firearms examiner for the Knoxville Police Department, testified that she examined and tested bullets, cartridge cases, and a revolver collected as evidence in this case. The bullet recovered from the back window area of the Ford Escort was a .38 caliber bullet fired from the victim's revolver. The bullet portion collected from the Buick's passenger-side door was part of a fired .22 caliber bullet. Two bullets collected from the victim's chest were .22 caliber long rifle bullets that had similar characteristics. Resig explained that although they were "rifle" bullets, they could have been fired from a .22 caliber revolver, semi-automatic pistol, or rifle. The two spent cartridge cases found behind the Escort and the Cutlass were .22 caliber long rifle Federal cartridge cases. Although they shared the same characteristics, Resig was unable to conclude they were fired from the same gun. On cross-examination, Resig testified that markings on the .22 caliber cartridge cases found behind the Escort and the Cutlass indicated they were probably fired from a .22 caliber semi-automatic pistol or rifle, not a revolver.

George Ronald Hammontree testified that on June 18, 2005, he and his wife were at Town View Towers for a friend's birthday party. At some point, Hammontree left the party in order to walk to his van to get a pack of cigarettes. Hammontree said that as he reached down in the van to pick up the cigarettes, he heard "a lot of ruckus," stood up, and saw "[a] lot of commotion" coming from a red and white car. Hammontree saw a black male holding a rifle and pointing it at an older man, who was sitting in the car and holding his hands up. Hammontree said that the man with the rifle had dreadlocks and that the rifle was equipped with a scope and had a "sheet" wrapped around the stock. A second black male and a white

female also were standing outside the car. Hammontree heard someone say, "Give it up, Give it up." He said that he "hit the floor" and that he heard "pat, pat, pat and boom." He said he was very familiar with guns and could tell from the sound of the gunshots that the first three came from a .22 caliber automatic gun and that the fourth shot "had to [come from] a nine millimeter, big caliber gun."

Hammontree testified that he stood up and saw "three people running in all directions." He said that the white female and second black male had been standing toward the front of the car and that the female "run so hard her tennis shoes flew off her feet." Hammontree went back to his friend's apartment. He said he did not check on the victim or call the police because his friend had to live in the apartment building and he was scared. One or two weeks later, Hammontree contacted the police and met with Investigator Steve Still. He said that Investigator Still showed him photographs of "six or eight people on a sheet" and that he identified the appellant's photograph as the shooter. He said the appellant's appearance at the time of the shooting was different than in the photograph because the appellant had dreadlocks on the day of the shooting. Hammontree also identified the appellant in court as the shooter. He said he was "[a] hundred percent" sure that the appellant shot the victim on June 18, 2005.

On cross-examination, Hammontree acknowledged having prior convictions for aggravated burglary, felony theft, and criminal impersonation and having pending charges for forgery and theft. He also acknowledged that at the appellant's preliminary hearing, he identified a man named Dan Alford as the shooter. He said the appellant and Alford looked alike and "both had their hair poofed out." He explained that he had been nervous at the hearing and misidentified Alford as the shooter. He acknowledged that he did not talk with Investigator Still until mid-July 2005 and that he did not see anything taken from the victim during the robbery. On redirect examination, Hammontree testified that the State had not promised him anything in return for his testimony.

Rebecca Ann Carpenter testified that in June 2005, she had a drug problem. On the morning of June 18, she went to Town View Towers and bought drugs. Then she walked toward the Old City and saw the victim's red and white Buick parked in a gravel parking lot. The victim motioned for Carpenter to come over, but he noticed when she got to the car that he had mistaken her for someone else. Nevertheless, Carpenter and the victim began talking. Carpenter asked if the victim would take her for a ride in the Buick, and the victim said yes. Carpenter said that she was not working as a prostitute "that day" and that the victim "was not the pervert type."

Carpenter testified that she began talking about buying some marijuana and that the appellant drove her to Town View Towers. The victim pulled out his wallet and gave

Carpenter eighteen dollars, and Carpenter saw he had a lot of money. Carpenter said she walked into the apartment complex and saw the appellant, whom she described as having "long hair. Kind of fro like. Kind of frizzy looking." She said she bought crack cocaine from him, "smoked it right there," and returned to the victim's car. As she was leaning on the passenger-side window and talking with the victim, she heard gunshots, looked up, and saw the appellant holding a long-barrel shotgun. Carpenter got down on the ground and heard more gunshots. When the shooting stopped, she reached into the Buick, grabbed her purse off the passenger seat, and ran. She saw the appellant, and he told her to go back to the parking lot, look for the bullet casings, and wipe her fingerprints off the car. She said that she did not want to go back to the parking lot but that the appellant told her, "Yes. That's how you do it." Carpenter said she "ran up the steps really, really fast so I ran out of my shoes" and returned to the Buick. She pretended to look for the shell casings, saw the victim slumped over the steering wheel, and thought he was dead. She said she hid the rest of the day and walked out of Knoxville the next day. Weeks later, she talked with the police. She said she never saw the victim with a gun on June 18.

On cross-examination, Carpenter testified that she was not standing at the front of the car at the time of the shooting but was leaning on the Buick's passenger-side window. She said the appellant was not standing beside the Buick's driver-side window but was "[a]bout a car away." Carpenter did not hear anyone say, "[G]ive it up." She acknowledged telling Investigator Still that she heard at least four or five gunshots but said at trial that she did not remember how many shots were fired. She said she did not remember if she drank anything in the victim's car but may have touched a soda can. She said the victim's wallet was still in his back pocket when she reached into the Buick and grabbed her purse. She acknowledged being convicted of tampering with government evidence in 2008.

On redirect examination, Carpenter acknowledged that Investigator Still showed her a photograph array on July 11, 2005, and that she identified the appellant as the man she bought drugs from and saw with the gun on June 18. The State showed Carpenter an array of six black and white photographs, and she identified it as the array Investigator Still showed her on July 11.

Sergeant Tony Willis of the Knoxville Police Department testified that on June 26, 2005, he learned Investigator Still was looking for a black male suspect, who had a missing tooth, went by the name "Travis," and may have been staying at an apartment in Town View Towers. Sergeant Willis said he went to the apartment complex and found the appellant "[i]n the very apartment that we were sent to check." The police found the appellant in the bathroom, and he appeared to be hiding. Officers arrested the appellant, the appellant told them his name was Travis Brabson, and they took him to meet with Investigator Still. On cross-examination, Sergeant Willis testified that a homicide warrant had not been issued for

-5-

the appellant when the police arrested him at Town View Towers.

Twenty-nine-year-old James Blackwell testified that he was incarcerated and serving a federal sentence for cocaine distribution. He said he had not been promised anything in return for his testimony and was testifying against the appellant "[t]o do the right thing." Blackwell said he met the appellant in 2002 and would see him "quite often." In June or July 2005, Blackwell was placed in the same unit with the appellant at the penal farm, and the appellant told him the following: Someone was supposed to bring a man over to buy drugs from the appellant. The appellant was going to get the money from the man, buy the drugs, and deliver the drugs to the man. When the appellant saw how much money the man had in his possession, he got a .22 caliber rifle instead of the drugs. He pointed the gun at the man and told the man to give him the money. The man pulled out a gun and shot at the appellant, and the appellant shot the man in the chest. The appellant took the money out of the man's pocket and later threw the gun over the James White Parkway bridge into the river. The appellant told Blackwell he shot and killed the victim in self-defense.

Blackwell testified that he could not remember if the appellant said a car was between the appellant and the victim at the time of the shooting. Blackwell also could not remember if the appellant said he shot the victim at close range. Blackwell thought the appellant told him the appellant took almost ten thousand dollars out of the victim's pocket. When Blackwell asked the appellant what he was going to do with the money, the appellant said he was going to hire a lawyer. Blackwell said he did not know George Hammontree or Rebecca Carpenter. At some point after the appellant told Blackwell about the shooting, Blackwell asked to speak with Investigator Still.

On cross-examination, Blackwell testified that in October 2004, he entered into a federal plea agreement to plead guilty to money laundering and conspiracy to distribute five kilograms or more of cocaine. Blackwell acknowledged that he had been facing a sentence of twenty years to life. On July 27, 2005, he met with Investigator Still. In October 2005, Blackwell was sentenced in his federal case to one hundred fifty-six months in confinement. He said he was "pretty sure" the federal government was informed about his conversation with Investigator Still.

Jennifer Milsaps, a special agent forensic scientist with the Tennessee Bureau of Investigation Crime Laboratory, testified that she analyzed swabs collected in this case and compared them to DNA collected from the victim and the appellant. DNA was not found on any of the swabs. Milsaps also analyzed the blood on the revolver and determined it was the victim's blood.

Investigator Steve Still testified that on June 18, 2005, he responded to a complaint of a dead person in a car at Town View Towers. When he arrived, the victim was in an ambulance. The police talked with several people who heard gunshots, but Investigator Still could not find any eyewitnesses to the shooting. Although the police did not find any identification on the victim, a check of the Buick's license tag showed it was registered to Robert Steely. Investigator Still said that he examined the physical evidence at the crime scene and that "it appeared that two people had been in a shoot out of some sort and had fired weapons at each other." One shot had been fired from the victim's revolver, and at least one shot had been fired from a .22 caliber weapon. Investigator Still thought the victim had been sitting in the car when he was shot and when he fired the revolver. Investigator Still went to the hospital and learned the victim was dead. He also spoke with the victim's daughters and went to the victim's home, where he found information about a woman named Patricia Hickman. Hickman had spent time in drug rehabilitation. However, Investigator Still was able to eliminate her as a suspect, and he began looking for Rebecca Carpenter.

Investigator Still testified that Sergeant Willis arrested the appellant on the night of June 26 and brought him to the police department. Investigator Still read Miranda warnings to the appellant, the appellant signed a waiver form, and Investigator Still interviewed him. The interview was video recorded, and the State played the recording for the jury. During the recorded interview, the appellant said the following: The victim's car pulled up, and the appellant saw a female, who appeared to be in her forties, get out. The appellant approached the victim, who was still sitting in the car, and said, "Hey, sir, may I please have a cigarette?" The victim "jumped over," reached under the seat, and pulled out a gun. The victim shot at the appellant, the appellant ran, and the appellant shot at the victim three or four times. At first, the appellant said the .22 caliber gun was "gone" and that he did not know where it was. However, he then told the investigator that he threw it into a quarry in the Halls community. The appellant told Investigator Still that he did not touch the victim's car or take the victim's wallet and that he shot the victim because he did not know if the victim was going to shoot at him again. He said that he was protecting himself, that he did not mean to hurt or kill the victim, and that the victim's gun was still pointed at him when he shot at the victim.

Investigator Still testified that after the interview, he and other officers took the appellant to the quarry in order for the appellant to show them where he threw the gun. A dive team went into the quarry but did not find the weapon. On July 11, 2005, Investigator Still interviewed Rebecca Carpenter and showed her a photograph array. Investigator Still acknowledged that she identified the appellant as a person who had been involved in the shooting. On July 18, 2005, Investigator Still interviewed George Hammontree. At some point, James Blackwell's lawyer contacted Investigator Still, and Investigator Still interviewed Blackwell. Investigator Still said that he did not offer to help Blackwell with his pending legal problems and that Blackwell did not ask for help.

On cross-examination, Investigator Still testified that he wrote down some names of people who had heard gunshots but that he did not ask any of them about the pattern of the shots. He acknowledged that the appellant always denied taking anything from the victim and that no one other than the appellant was charged in this case.

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox County, testified that she performed the victim's autopsy. The victim received three gunshot wounds, but Dr. Mileusnic-Polchan could not tell the order in which they were received. One of the bullets entered the back of the victim's left arm; exited the arm; and entered his chest, fracturing two ribs and damaging a lung. The bullet traveled left to right and slightly upward and was recovered from the victim's left chest. The wound was potentially survivable, and the victim would have remained conscious for several minutes. A second bullet entered the front of the victim's left arm, exited the arm, grazed the left chest, continued toward the right side of the car, and struck the passenger door. The bullet traveled left to right and slightly upward, and it did not create a fatal wound. A third bullet entered the back of the victim's left chest, fractured two ribs, struck his left lung, and struck his aorta. In then traveled into his right chest and struck a rib. The bullet traveled left to right and slightly upward and was recovered from the right chest. Dr. Mileusnic-Polchan stated that the victim would have survived for five to ten minutes after he was struck with the third bullet and that he would have remained conscious long enough to have picked up a gun and fired it. She said that the victim was leaning toward the passenger side of the car when he was shot and that nothing on his clothes indicated he had been shot at close range. The victim tested negative for alcohol and illegal drugs but had a small amount of an antidepressant in his system.

On cross-examination, Dr. Mileusnic-Polchan testified that the appellant's weapon was at least two to three feet away from the victim when it was fired. On redirect examination, she testified that the third bullet made no contact with the victim's arms, meaning his arms could have been raised.

The then twenty-nine-year-old appellant testified that his name was "Travis Kinte Echols -- I mean Brabson." He said that his mother's last name was Echols, that his father's last name was Brabson, and that his last name was legally changed from Echols to Brabson when he was fifteen years old. He said that on June 18, 2005, he was living "wherever [he] could" and was at Town View Towers "[w]aiting for customers." He saw the victim's car pull into the parking lot with a white man and woman inside. He said he approached the driver's side and asked the man for a cigarette as a way to "break the ice so I can ask them if they want to buy crack cocaine." He said the victim "just freaked out on me," reached under the seat for a gun, and pulled out the gun. The appellant said he turned around, "ducked," and heard "a blast from the gun." The appellant pulled a .22 caliber semi-automatic pistol out of his back pocket, fired three or four shots, and ran. He said he did not

go into the victim's car or rob the victim.

The appellant testified that he shot at the victim because the victim shot at him first and because he was scared. No one other than the appellant was around the victim's car at the time of the shooting. After the shooting, the appellant ran away from Town View Towers and borrowed a car for a few hours. He drove to a quarry and threw the pistol into it. He said he never had a conversation with James Blackwell at the penal farm because Blackwell was wearing a federal beige uniform and federal prisoners housed at the farm were "[s]nitches." He said he had never worn dreadlocks and that his hair was not even long enough to braid on June 18. He acknowledged killing the victim but said he feared for his life. He said he did not rob or attempt to rob the victim and that the incident took place in five to ten seconds.

On cross-examination, the appellant acknowledged that although his last name was legally changed to Brabson when he was fifteen, he used the last name Echols many times and signed documents as Echols. He said he used the last name Echols in this case because he was charged under that name. He said that he did not have a drug dealing business and that he was selling drugs "to survive." He said he approached the victim's car because "[n]ot too many white people just pull into Town View unless they was looking for crack cocaine." When the victim pulled up, the female got out of the car. The appellant yelled to her, but she ignored him and walked away, so he thought she was going to buy drugs from someone else. He said he walked up to the driver's side of the victim's car and asked the victim, "[S]ir, may I please have a cigarette?" He said that he did not have his gun pulled but that the victim "freaked out." The appellant saw the victim's gun and ducked, and the victim shot at him. The appellant shot at the victim and ran. He did not know he had struck the victim. He said he was not hiding in the bathroom when Sergeant Willis found him but acknowledged telling Investigator Still that he was hiding in the bathroom because he knew the police were looking for him. He acknowledged being charged in February 2001 with passing a forged check but denied operating a stolen vehicle in May 1998. Both charges were later dismissed. The jury convicted the appellant of first degree felony murder committed during the perpetration of robbery.

## II. Analysis

### A. Batson Challenge

The appellant contends that the State improperly used a peremptory challenge to remove one of only two African Americans from the jury panel. The State argues that the appellant has failed to prove it used its peremptory challenge in a discriminatory manner. We agree with the State.

During jury voir dire, the prosecutor used a peremptory challenge to excuse prospective juror Redding from the panel. The defense challenged Redding's dismissal, stating, "Your Honor, there are two individuals who are black on this jury. She's one of them. She hasn't been asked any specific questions by the State." The prosecutor explained, "[S]he asked the court officer something. She won't make eye contact with me. And she wouldn't make eye contact with [defense counsel]. I just get the sense that she does not want to be here." The trial court said, "Well, . . . I've noticed also some of the things he's talking about. She has gotten the officer's attention a couple of times. I don't know exactly why." Defense counsel noted that potential juror Carter, a white male, "said specifically that he did not want to be here" but was still seated on the panel. The trial court informed the parties that it had spoken with the court officer, who told the court that Redding had asked to leave the courtroom in order to make a telephone call and reschedule an appointment. The prosecutor stated that "as time went on [Redding] started kind of rocking back a little bit in her chair and fidgeting and not looking anybody in the eye. And to my view, rose to the level of almost being angry about still being seated there." The trial court ruled,

> [M]y inquiry tends to confirm that the young lady was anxious, that she had somewhere else she wanted to be, and that she, in fact, asked for permission to leave the courtroom. So I think there is evidence to support the General's position, and I respectfully overrule the Motion -- or the objection rather.

In Batson v. Kentucky, 476 U.S. 79 (1986), the United States Supreme Court held that the prosecutor's use of peremptory challenges to intentionally exclude jurors of the defendant's race violated his right to equal protection under the Fourteenth Amendment to the United States Constitution. In Powers v. Ohio, 499 U.S. 400 (1991), the Court eliminated the requirement that the defendant and any wrongfully excluded juror(s) be of the same race. See State v. Ellison, 841 S.W.2d 824, 826 (Tenn. 1992). Thus, under Powers, a defendant can establish a prima facie case of purposeful discrimination by showing that the prosecution excluded members of a cognizable racial group from the venire. Id. To invoke Batson protections, a defendant must establish a prima facie case that a juror is being challenged on the basis of race or gender. See Batson, 476 U.S. at 94. Once the defendant has presented a prima facie case of purposeful discrimination, the trial court shall require the State to give a race-neutral reason for the challenge. Id.

Our supreme court has emphasized that under Batson, a trial court "must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination." State v. Hugueley, 185 S.W.3d 356, 369 (Tenn. 2006) (quoting Woodson v. Porter Brown Limestone Co., 916

S.W.2d 896, 906 (Tenn. 1996)). In the present case, the trial court did not expressly find that the appellant had made out a prima facie case of racial discrimination, yet it required the prosecutor to provide his reason for striking Redding. Therefore, we will proceed on the assumption that the trial court found that a prima facie case was established. See, e.g., Hugueley, 185 S.W.3d at 371; Woodson, 916 S.W.2d at 905 (Tenn. 1996).

The prosecutor stated that he struck Redding from the panel because she would not make eye contact, was fidgeting, and seemed angry to still be there. As the Hugueley court observed, "If a race-neutral explanation is provided, the trial court must then determine, from all of the circumstances, whether the defendant has established purposeful discrimination." Id. at 368 (citing Batson, 476 U.S. at 98). The "trial court may not simply accept a proffered race-neutral reason at face value but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual." Id. (citing Miller-El v. Dretke, 545 U.S. 231 (2005)). In this case, the trial court noticed behavior from Redding that supported the State's explanation. We conclude that the totality of the circumstances do not support a finding of purposeful discrimination and that the trial court properly overruled the appellant's Batson challenge.

### B. Inappropriate Questions During Voir Dire

The appellant contends that the prosecutor asked the prospective jurors inappropriate questions during voir dire. Specifically, he alleges that the prosecutor improperly elicited a pledge from the potential jurors by asking each one if he or she would vote to find the appellant guilty. The State argues that the prosecutor's questions were not improper. We agree with the State.

Control of voir dire is within the sound discretion of the trial court and will not be found to be in error unless an appellant shows prejudice. State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993). Our supreme court has ruled that "[t]he ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial." State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994).

The record reflects that the prosecutor asked the jurors, "If I prove to you that this defendant intended to commit a robbery, and that he committed a robbery and somebody died, can you find him guilty of felony murder?" The defense objected to the "improper question," and the trial court overruled the objection. The prosecutor then asked each potential juror, "If I prove those [elements] to you, can you vote to find him guilty?" All of the jurors answered in the affirmative.

In our view, the State was not asking the potential jurors for a promise to convict the appellant. Instead, the State was asking the jurors if they could find him guilty if the State proved the elements of the crime beyond a reasonable doubt. The prosecutor's questions were not improper, and the trial court properly overruled the appellant's objection.

## C. Motion to Suppress

The appellant claims that the trial court erred by denying his motion to suppress his statement to Investigator Still because the police lacked probable cause to arrest him and he did not voluntarily waive his Miranda rights. The State contends that the trial court properly denied the motion to suppress. We conclude that the trial court erred by admitting the statement into evidence because the police did not have probable cause to arrest the appellant for the crime but that the error was harmless.

The appellant filed a pretrial motion to suppress his statement, arguing that it was the product of an arrest without probable cause and that he did not knowingly waive his Miranda rights. At the suppression hearing, Sergeant Willis testified that on June 26, 2005, he received information from Investigator Still that the suspect in the shooting was in an apartment at Town View Towers. The suspect was described as an African-American male named "Travis," who was missing a front tooth and was possibly in apartment number 218, building D. Sergeant Willis and other officers went to the apartment and knocked on the door. Sergeant Willis said a white female, "who was certainly in control of the apartment," answered the door. The officers told her why they were there, she gave them permission to search, and the officers walked to the apartment's bathroom. The bathroom door was closed, so Sergeant Willis told whoever was inside to come out. The appellant came out of the bathroom and got down on the floor as the officers instructed. He fit the description of the suspect, and the officers handcuffed him. They asked the appellant his name, and he told them his name was Travis Brabson. The officers took the appellant to the police department to talk with Investigator Still. Sergeant Willis said that sometime after the appellant's arrest but before he was taken up to the third floor of the police department to meet with Investigator Still, the officers checked his record and learned he had an outstanding warrant.

On cross-examination, Sergeant Willis acknowledged that he was not aware of any outstanding warrants for the appellant at the time of the appellant's arrest. He never advised the appellant of the appellant's rights.

Investigator Still testified that during the week after the shooting, a female told him that a woman named Amanda Harshaw had some information about the appellant's involvement in the shooting. Investigator Still went to Harshaw's place of employment and spoke with her. Investigator Still said Harshaw told him that she had allowed a black male

named Travis, who was missing a front tooth, to use the telephone in her apartment and "overheard his conversation where he was talking about shooting someone in lot C in Town View." Harshaw told Investigator Still that she would call him if the man showed up at her apartment again. On the night of June 26, 2005, Investigator Still was at home and received a telephone call from someone other than Harshaw. The person told him that Travis was at Harshaw's apartment. Investigator Still contacted Sergeant Willis and told him to go to the apartment and detain the suspect. As Investigator Still was driving to the police department, he learned officers had the appellant in custody. At the police department, Investigator Still advised the appellant of his rights and interviewed him. The State played a video recording of the interview for the trial court. According to the recording, the interview began at 12:05 a.m. on June 27.

On cross-examination, Investigator Still testified that he informally interviewed Harshaw at her place of employment on June 23 and formally interviewed her at the police department on July 6. He said, "She told me she overheard him make the statement I told you. I don't think we got into specifics[.]" He said he thought he checked her criminal record and that she did not have a criminal history. He acknowledged that the police had investigated other shootings in parking lot C but said that "there were none that week." When the defense asked Investigator Still if he had any information to show the appellant's telephone conversation was referring to the victim's shooting, Investigator Still said, "I think the correct answer to your question is the information from Amanda [Harshaw] that what she had [heard] on the phone."

Investigator Still testified that before the appellant's interview, he read a waiver of rights form to the appellant and showed him where to sign the form. He acknowledged that the appellant hesitated to sign the form because Investigator Still had not told the appellant what the interview was about. However, Investigator Still told the appellant that he was going to explain the subject of the interview and that the appellant could stop the interview at any time. The appellant signed the form. Investigator Still said the appellant never requested an attorney during the interview. At the time of the appellant's arrest, he had an outstanding warrant for failure to appear.

Regarding the appellant's arrest, the trial court ruled as follows:

> This Court would find that they had reasonable basis, reasonable suspicion to justify a brief detention to make inquiry about this defendant's connection to the homicide. And for -- since it was a homicide case, the Court would extend that to the sake of officer safety to cuff him and take him into custody.

-13-

Now at that point if they'd gotten no information they would have to just -- if that's all that we had, they would have had to release him and try to get a warrant. And I don't know if they could get a warrant on that or not, it would be pretty close. I'm not sure they could get it.

But there is another factor involved here. The fact is, there was a warrant outstanding for the defendant's arrest. The case law is very clear, it doesn't matter whether the police are aware of that or not[.]

Regarding the appellant's waiver of rights, the trial court noted that Investigator Still advised the appellant of his rights and that the appellant said he understood each right. The court stated that nothing indicated Investigator Still had intimidated or coerced the appellant and that the investigator told the appellant he could stop the interview at any time. The court concluded that the appellant voluntarily waived his Miranda rights and talked with the investigator. The trial court denied the motion to suppress.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Odom, 928 S.W.2d at 23.

First, we will address whether the police had probable cause to arrest the appellant. Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect citizens against unreasonable searches and seizures. Our supreme court has previously noted that, generally, "[A]rticle I, section 7 is identical in intent and purpose with the Fourth Amendment." State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (citation and quotation marks omitted). "However, neither the Fourth Amendment nor Article I, section 7 limit all contact between police and citizens." State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000). Our courts have articulated three categories of police-citizen interaction and their corresponding evidentiary requirements: "(1) full-scale arrest, which must be supported by probable cause; (2) brief investigatory detention, which must be supported by reasonable suspicion of criminal activity; and (3) brief police-citizen encounter

-14-

that requires no objective justification." State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009) (citations omitted); see also State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006).

Initially, we note that the trial court found that the police officers had reasonable suspicion to stop the appellant briefly and ask about his connection to the homicide. However, the evidence established that the officers did not merely stop the appellant in order to question him briefly. Instead, the officers entered the apartment and ordered him out of the bathroom for the purpose of placing him under arrest. Therefore, this was not a brief investigatory stop that had to be supported by reasonable suspicion but a full-blown arrest that had to be supported by probable cause. See Downey, 945 S.W.2d at 106.

Tennessee Code Annotated section 40-7-103(a)(3) provides that an officer may arrest a person without a warrant "[w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested has committed the felony." "Our courts make little, if any, distinction between the terms 'reasonable cause' and 'probable cause' in determining whether there exists a basis for an arrest." State v. Herbert Lee Massey, No. 01C01-9406-CR-00218, 1995 Tenn. Crim. App. LEXIS 736, at **9-10 (Nashville, Sept. 1, 1995). Probable cause "means more than bare suspicion" and "exists where the facts and circumstances within . . . the officer['s] knowledge, and of which [he] had reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." State v. Day, 263 S.W.3d 891, 902 (Tenn. 2008) (quotation marks and brackets omitted). "Whether probable cause is present depends upon whether the facts and circumstances and reliable information known to the police officer at the time of the arrest 'were sufficient to warrant a prudent man in believing that the [individual] had committed an offense.'" Downey, 945 S.W.2d at 106 (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)).

Tennessee Rule of Criminal Procedure 4(b) provides that in the application for the issuance of an arrest warrant, "[t]he finding of probable cause shall be based upon evidence, which may be hearsay in whole or in part provided there is a substantial basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished." It has long been established that "[w]hile this rule applies itself particularly to warrants for arrest, the same principle must be considered applicable to establish probable cause where an arrest has been made without a warrant." State v. Raspberry, 640 S.W.2d 227, 228 (Tenn. Crim. App. 1982); see also State v. Tays, 836 S.W.2d 596, 600 (Tenn. Crim. App. 1992).

In the instant case, the only information the police had about the suspect at the time of the arrest was that he was a black male named Travis, who was missing a front tooth and had told someone over the telephone that he had shot someone in lot C of Town View

Towers. The trial court found that this information alone probably would not have been enough to establish probable cause for the officers to obtain an arrest warrant. We agree that the information was insufficient to establish probable cause. At the time of the appellant's arrest, no one had identified him as the person who had shot the victim or participated in the robbery. Moreover, nothing in the appellant's telephone conversation linked him to the shooting in question. The trial court found that the appellant's having an outstanding warrant justified the arrest even though the officers did not know about the warrant.[1] However, if that were true, then a police officer could arrest anyone without probable cause, check the person's background for an outstanding warrant, and then use the outstanding warrant as justification for the warrantless arrest. We note that the police officers in this case did not even have enough information to check for an outstanding warrant until after they arrested the appellant and learned his last name was Brabson. Therefore, the evidence preponderates against the trial court's findings, and we conclude that the police officers did not have probable cause to arrest him for killing the victim.

Next, we will address whether the appellant's statement is sufficiently attenuated from the illegal arrest to warrant its admission at trial. In determining whether evidence, such as a statement given to police after an unlawful arrest, is the fruit of a prior illegality, the "apt question . . . is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Wong Sun v. United States, 371 U.S. 471, 488 (1963) (quoting Maguire, Evidence of Guilt 221 (1959); see also State v. Garcia, 123 S.W.3d 335, 346 (Tenn. 2003). In our analysis, we may consider the following factors:

> (1) the presence or absence of Miranda warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and finally, of particular significance, (4) the purpose and flagrancy of the official misconduct.

State v. Huddleston, 924 S.W.2d 666, 674-75 (Tenn. 1996). The State is required to prove by a preponderance of the evidence that the evidence is admissible. State v. Dean, 76 S.W.3d 352, 362 (Tenn. Crim. App. 2001).

---

[1] We note that the State's entire argument regarding this issue consists of the following sentence: "Further, the trial court correctly found that the officers had probable cause to arrest the defendant before the interview because he had an outstanding warrant." Rule 27(a)(7), Tennessee Rules of Appellate Procedure, requires that a brief include citations to authorities in support of an appellant's argument. This rule also applies to the appellee. Tenn. R. App. P. 27(b).

In the instant case, Investigator Still gave <u>Miranda</u> warnings to the appellant, read a waiver of rights form to him, and had the appellant sign the form. Therefore, this factor weighs in favor of the statement's admissibility. <u>See</u> <u>State v. Carter</u>, 16 S.W.3d 762, 767 (Tenn. 2000). The temporal proximity of the arrest and the confession weighs against the statement's admissibility because the time between the illegal arrest and the confession was short, less than two hours. <u>See</u> <u>State v. Garcia</u>, 123 S.W.3d 335, 346-47 (Tenn. 2003). The third factor also weighs in favor of inadmissibility because no intervening circumstances were present. Finally, the purpose and flagrancy of the official misconduct supports inadmissibility. Neither Investigator Still nor Sergeant Willis testified that they thought they had probable cause to arrest the appellant for shooting the victim, and neither of them was aware of the appellant's outstanding warrant at the time of the arrest. Thus, after considering the four factors, we conclude that the trial court should have suppressed the appellant's confession.

That said, we believe the trial court's error was harmless. "[T]he issue of whether an error is harmless does not turn upon the existence of properly admitted evidence that is sufficient to affirm a conviction. The key question is whether the error likely had an injurious effect on the jury's decision-making process." <u>State v. Dotson</u>, 254 S.W.3d 378, 389 (Tenn. 2008); <u>see</u> Tenn. R. App. P. 36(a). In this case, George Hammontree and Rebecca Carpenter, eyewitnesses to the shooting, testified that they saw the appellant point the gun at the victim. Hammontree also testified that just before the shooting, he heard someone tell the victim to "[g]ive it up." James Blackwell testified that the appellant told him the appellant shot the victim in self-defense. However, given that Hammontree, who was familiar with guns, heard the appellant's .22 caliber gun fire first, the jury reasonably rejected the appellant's self-defense claim. Therefore, although the trial court improperly admitted the appellant's statement into evidence, the error was harmless because it was cumulative to Blackwell's testimony and did not change the outcome of the trial.

Although we have determined that the trial court should have granted the appellant's motion to suppress for lack of probable cause for his arrest, given the possibility of further appellate review, we will also address whether the appellant voluntarily waived his <u>Miranda</u> rights. An accused may waive his <u>Miranda</u> rights so long as the waiver is voluntarily, knowingly, and intelligently made. <u>See</u> <u>State v. Callahan</u>, 979 S.W.2d 577, 581 (Tenn. 1998). To establish a valid waiver of <u>Miranda</u> rights, "the State need only prove waiver by a preponderance of the evidence. In determining whether the State has satisfied that burden of proof, courts must look to the totality of the circumstances." <u>State v. Bush</u>, 942 S.W.2d 489, 500 (Tenn. 1997) (citation omitted). In the course of our examination, we consider the following factors in determining the voluntariness of a confession: the appellant's age; education or intelligence level; previous experience with the police; the repeated and prolonged nature of the interrogation; the length of detention prior to the confession; the lack

-17-

of any advice as to constitutional rights; the unnecessary delay in bringing the appellant before the magistrate prior to the confession; the appellant's intoxication or ill health at the time the confession was given; deprivation of food, sleep, or medical attention; any physical abuse; and threats of abuse. Huddleston, 924 S.W.2d at 671. Proof that an accused was made aware of his Miranda rights, although not conclusive, weighs in favor of the admission of a confession into evidence. See State v. Carter, 16 S.W.3d 762, 767 (Tenn. 2000).

The appellant contends that he did not voluntarily waive his rights because he could not read or write well, was forced to sign the waiver form before Investigator Still would tell him what the interview was about, and was compelled to confess by Investigator Still's telling him the interview was the appellant's chance to give his side of the story. Our review of the recorded interview shows that Investigator Still read each right to the appellant and had the appellant initial each right on the waiver form. The appellant hesitated to sign the form. However, Investigator Still told the appellant that the appellant could stop the interview at any time, and the appellant signed the form. The appellant was twenty-six years old at the time of the interview, a high school graduate, and had some previous experience with the police. The appellant's detention prior to the interview was brief; the interview was relatively short, lasting only thirty minutes; and the appellant was advised of his rights before the interview. The appellant was not intoxicated or ill at the time of the confession; nothing indicated he had been deprived of food, sleep, or medical attention; and nothing indicated the police had physically abused him or threatened abuse. Therefore, we agree with the trial court that the circumstances surrounding the confession show the appellant voluntarily waived his Miranda rights.

### D. Witness Identifications

The appellant contends that the trial court erred by refusing to consider his motion to suppress Hammontree's and Carpenter's pretrial and in-court identifications of him as the shooter. The State contends that the trial court properly dismissed the motion for lack of specificity. We conclude that the appellant has waived this issue.

Before trial, the appellant filed a motion to suppress "any identification made of him by George Hammontree and/or Rebecca Carpenter," alleging that the identifications were based on "unconstitutional identification procedures concerning presentation and production of photographs, including single photographs." At the pretrial motions hearing, counsel for the appellant alleged that Hammontree and Carpenter had identified the appellant from a single photograph as opposed to photograph arrays. According to defense counsel, "[W]hat we were given are videotapes that show these individuals talking to [Investigator Still], that those individuals signed single photographs identifying Mr. Echols as the individual that they saw." Therefore, the identification procedures were unduly suggestive, unreliable, and

tainted any potential in-court identifications. The trial court noted that the written motion lacked specificity but that "if you want to call [Investigator Still] to the stand and go into the matter, I'm here to listen." Counsel did not say anything further, and the trial court moved on to the appellant's motion to suppress his statement. At the conclusion of that suppression hearing, counsel again brought up his motion to suppress the identifications, and the trial court stated that it was denying the motion for lack of specificity.

The appellant contends that the trial court erred by refusing to consider the motion. However, the motions hearing transcript reveals that the trial court gave counsel the opportunity to question Investigator Still about the matter. Although Investigator Still was present and testified during the hearing on the motion to suppress the appellant's statement, counsel decided, for whatever reason, not to question him about Hammontree's and Carpenter's identifications. Therefore, this issue has been waived. See Tenn. R. App. P. 36(a).

### E. Request for Mistrial

The appellant contends that the trial court erred by denying his motion for a mistrial when the State implied during its opening statement that the appellant had a criminal record. The State argues that the trial court properly denied the motion for a mistrial. We agree with the State.

During his opening statement, the prosecutor stated as follows:

> On that particular day, June 26th, I think Mr. Echols had some type of process out. He was taken to jail here. And Steve Still was informed this fellow that you've been calling Travis Brabson, we've got him as Echols. And that's why his name is Echols. The system, if you will, that provides names, identifying information, date of birth, social security number, those types of things, this defendant has used the name of Travis Echols frequently and often.

The defense objected and moved for a mistrial, arguing that the prosecutor's comment about the appellant's using the name Travis Echols "frequently and often" implied the appellant had a prior arrest record. The prosecutor argued that because defense counsel continually referred to the appellant as "Mr. Brabson," the State was entitled to tell the jury why the appellant had been indicted as Travis Echols. The trial court ruled as follows:

-19-

[W]hat I heard the General say was that Mr. Echols is known to the police department, the criminal justice system as Echols, and that's the end of that sentence. And Mr. Echols has used the name frequently and often. He didn't say he's been charged with many crimes or any crimes. It's getting close, General. I don't want you to go into any kind of criminal record or imply that he has one.

The trial court stated that the prosecutor had not "done that at this point" and denied the motion for a mistrial. Defense counsel asked the trial court to instruct the jury that the prosecutor's argument was improper, but the trial court refused, stating, "I'm afraid the instruction you're asking me to give them will put in their minds now to connect frequently and often with the proposition of being arrested." The appellant contends that the trial court should have granted his request for a mistrial.

Opening statements "are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove." Harris v. Baptist Memorial Hospital, 574 S.W.2d 730, 732 (Tenn. 1978). "Trial courts have wide discretion in controlling arguments of counsel, including opening statements, and a trial court's ruling concerning the arguments of counsel will not be reversed absent an abuse of discretion." State v. Stacy Johnson, No. W2004-00464-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 262, at *41 (Jackson, Mar. 15, 2005) (citing State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)).

We agree with the trial court that the prosecutor's statements only informed the jury that the appellant was known to the police department as Travis Echols. The prosecutor did not inform the jury as to how the police knew him by that name. We note that on cross-examination, the prosecutor questioned the appellant extensively about his use of the last names Brabson and Echols and that the appellant admitted he continued to use the name Echols even though his last name was legally changed to Brabson when he was fifteen years old. The prosecutor's opening statement was not improper. Therefore, the trial court did not err by denying the appellant's request for a mistrial.

F. Darlene Thomas' Testimony

The appellant contends that the trial court erred by allowing Darlene Thomas to testify about the victim's good character, by allowing her to testify about the victim's habit of carrying large sums of money, and by commenting to the jury about the habit. He also contends that the trial court erred by limiting his cross-examination of Thomas because he was entitled to show she was biased against him. The State concedes that Thomas should

not have testified about the victim's "background information" but argues that the error was harmless. The State also argues that the trial court properly allowed Thomas to testify about the victim's habit of carrying money and properly limited the appellant's cross-examination of her. We conclude that the appellant is not entitled to relief.

1. Victim's good character

Thomas testified that the victim served in the United States Army, got married, and had four children. She said that her mother, the victim's wife, became paralyzed in 1982 and that the victim had to look after his wife and their children. In 2000, Thomas's mother was placed in a nursing home because the victim could no longer care for her. Thomas said that her mother died two years later and that the victim's mental capacity "started going down hill a little bit." The State asked Thomas to tell the jury about the victim's "relationship" with the 1958 Buick, and the defense objected, arguing that Thomas' testimony was irrelevant. The trial court ruled that the State could "personalize the victim to some extent" but that the State should "wrap it up." The appellant contends that Thomas' testimony about the victim's good character was improper.

Tennessee Rule of Evidence 404(a) provides that, generally, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." The State concedes that Thomas' background testimony about the victim was improper. However, as noted by the State, the appellant did not object to Thomas' testimony until the State asked her about the victim's relationship with the Buick. At that point, the trial court told the State to "wrap it up," and the State stopped questioning Thomas about her father's background. By failing to make a contemporaneous objection to Thomas' testimony, the appellant has waived the issue. See Tenn. R. App. P. 36(a).

2. Habit Testimony

During Thomas' direct examination testimony, the State asked if the victim carried "[l]ots of money," and she said yes. The defense objected, and the trial court instructed the State to establish Thomas' personal knowledge for her testimony. The State asked Thomas if she had seen the victim carrying money, she said yes, and the defense objected again. The trial court said, "This is evidence of habit." The defense disagreed, but the trial court instructed the jury as follows:

> The Court understands the evidence fairly to be that when the
> decedent went out and did whatever he did during his daily
> conduct, it was his habit to carry money with him. I'll allow that

-21-

in as evidence of a habit.

The State resumed questioning Thomas. She said the victim did not have a bank account and "might have seven or eight thousand dollars on him at one time." The appellant argues that Thomas' testimony was not habit evidence and that it prejudiced him because it supported the State's unsubstantiated claim that the victim had cash with him on the day of the shooting. The appellant also claims that the trial court's comment to the jury about the evidence was improper.

Rule 406(a), Tennessee Rules of Evidence, provides in relevant part, "Evidence of the habit of a person . . . whether corroborated or not and regardless of the presence of eye-witnesses, is relevant to prove that the conduct of the person . . . on a particular occasion was in conformity with the habit or routine practice." A "habit" is defined as "a regular response to a repeated specific situation." Tenn. R. Evid. 406(b). "The key element of proof of either habit or routine practice is extreme regularity." Neil P. Cohen et al., Tennessee Law of Evidence § 4.06[6][a] (5th ed. 2005).

Turning to the instant case, the State did not ask Thomas how often the victim carried large amounts of money on his person or if he did so with extreme regularity. Therefore, we question whether her testimony constitutes habit evidence, and the trial court should not have referred to the victim's carrying money as part of his "daily conduct." In any event, Rebecca Carpenter testified that the victim pulled out his wallet shortly before the shooting and that she saw "[l]ots of money. Lots of money." Therefore, we conclude that any error in admitting Thomas' testimony was harmless. See Tenn. R. App. P. 36(a).

3. Cross-examination of Thomas

During the appellant's cross-examination of Thomas, defense counsel asked, "Ms. Thomas, who's Bennie Pruitt?" Thomas answered, "George Hammontree's aunt." Defense counsel then asked, "Who's got him charged with a criminal offense, right?" The State objected, and the trial court held a bench conference. During the conference, the defense informed the trial court that Thomas had been contacting Pruitt, the victim of Hammontree's pending forgery charges, and that defense counsel should be allowed to question Thomas about her bias toward Hammontree. The trial court ruled that the defense could question Thomas about her relationship with Hammontree, but "that's as far as it goes. We'll wait for Mr. Hammontree to testify." Cross-examination resumed, and the following exchange occurred:

> Q    Do you have a relationship with George Hammontree?

A      No.

Q      Why would you be calling Ms. Pruitt then?

[The State]: Objection, your Honor. I thought the Court sustained this.

THE COURT: It is cross, if she's got an answer as to why she would call Ms. Pruitt then I'll let her answer. Go ahead.

A      Because I found out that that was Hammontree's aunt.

. . . .

[Defense counsel]: Under the Court's ruling, we have no further questions.

The appellant contends that the trial court erred by limiting his cross-examination of Thomas because he was entitled to reveal her relationship with Hammontree and her efforts to help Hammontree with pending charges in exchange for his testimony against the appellant. The State argues that the trial court properly limited the cross-examination because it was irrelevant.

A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987); State v. Brown, 29 S.W.3d 427, 430-31 (Tenn. 2000). Denial of a defendant's right to effective cross-examination is "constitutional error of the first magnitude" and may violate the defendant's right to a fair trial. State v. Hill, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting Davis v. Alaska, 415 U.S. 308 (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the discretion of the trial court." State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." State v. Reid, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994). We will not disturb the limits that a trial court has placed upon cross-examination unless the court has unreasonably restricted the right. Dishman, 915 S.W.2d at 463.

The trial court did not explain why it was limiting the appellant's cross-examination of Thomas. In any event, the appellant did not make an offer of proof regarding what Thomas' testimony would have been. Moreover, although the trial court indicated that the defense could cross-examine Hammontree about the issue, the defense did not ask Hammontree about his having contact or a relationship with Thomas. Therefore, we cannot say that the trial court unreasonably restricted the appellant's right to cross-examine her.

## G. Redacted Video Recording

The appellant contends that the trial court erred by allowing the State to play for the jury a redacted recording of his statement when the State had not provided the defense with a redacted copy. The State argues that the trial court did not err by allowing the State to play the redacted version for the jury. Although we have already determined that the appellant's statement to Investigator Still was inadmissible, we will address this issue to facilitate further appellate review. We conclude that the trial court erred by allowing the State to play the redacted recording and by not allowing the appellant to cross-examine Investigator Still about the redacted portions. Nevertheless, we conclude that the errors were harmless.

During Investigator Still's testimony, the State requested to play a redacted video recording of the appellant's statement. The State told the trial court, "I have redacted out references to him going to jail, having a record, whatever." Defense counsel objected because he had not seen the redacted version and asked to watch the redacted recording "because I don't know whether they've taken out some of the material that we need in here, your honor." The trial court allowed the State to play the redacted recording for the jury and ordered that it be made an exhibit for purposes of appeal. However, the trial court did not allow the appellant to watch the recording prior to it being played and prohibited the appellant from questioning Investigator Still about the redactions on cross-examination.

The appellant contends that he was prejudiced by the redacted statement because it excluded Investigator Still's telling the appellant that (1) "there is one spectrum where you could spend the rest of your life in jail . . . and it just depends on what you tell me. But it's a big difference between cutting a little bit of time and spending the rest of your life in jail"; and (2) "and if you don't need to spend the rest of your life in jail, I don't want to be a part of that, but you've got to be straight up with me, and you've got to be truthful . . . I know the guy shot at you." The appellant argues that those redacted comments prevented the jury from being able to consider whether his confession was reliable and voluntary.

Initially, we note that redaction of the appellant's statement was not warranted in this case. The State argued at trial and argues on appeal that the redaction was proper because evidence of possible punishment is prohibited by Tennessee Code Annotated section 40-35-

201(b), which provides, in pertinent part, that [i]n all contested criminal cases, except for capital crimes . . . the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury on possible penalties." During the redacted portions of the video recording, Investigator Still commented about the possibility of the appellant spending his "life in jail." However, at the time of the interview, the appellant had not been charged with a crime. In our view, Investigator Still was not commenting on a life sentence for felony murder but was referring to the possibility that the appellant was facing a lengthy sentence in confinement for shooting the victim. In other words, his comments were not the references to punishment contemplated by the statute.

Furthermore, we are puzzled as to why the State refused to provide the appellant with a redacted version of the recorded statement prior to trial or why the trial court refused to allow the appellant to view the redacted version, which was only about thirty minutes in length, prior to it being played for the jury. Tennessee Rule of Evidence 106, the "rule of completeness," provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part of any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Without the redacted version, the appellant could not determine what portions of the interview had been edited out of the original. Therefore, he had no way to argue which redacted portions, if any, ought to be considered contemporaneously with the redacted recording.

The appellant argued that he should have been allowed to question Investigator Still about the redacted portions because the jury needed to consider the circumstances surrounding the taking of the statement. However, the trial court refused, noting that it had already determined the confession was voluntary. Although the trial court determines the admissibility of a confession, the jury "is to determine whether defendant made the confession and whether the statements contained in it are true. To aid them in resolving these questions the jury may hear evidence of the circumstances under which the confession was procured." State v. Pursley, 550 S.W.2d 949, 950 (Tenn. 1977) (quoting Wynn v. State, 181 S.W.2d 332, 333 (1944)). Given that the investigator pressured the appellant to talk to him in the redacted portions, the trial court should have allowed the appellant to cross-examine Investigator Still about the redacted portions.

In any event, we hold that the errors were harmless. The appellant claims he was prejudiced because the redacted portions of the statement deprived the jury from determining the reliability and voluntariness of the statement. However, on redirect examination, Investigator Still described, in detail, the tactics he used to get the appellant to talk with him. He explained that he used the "minimalization" technique, in which "you make light of what someone does." Investigator Still testified that he used that technique by telling the

appellant, "I know the guy shot at you," implying the appellant shot the victim in self-defense. Investigator Still also said he lied to the appellant in order to get the appellant to talk with him because at that point in the investigation, "I had virtually nothing." In light of his testimony and the appellant's failure to show how he was prejudiced, we conclude that the appellant's not being allowed to question Investigator Still about the redacted portions of the recording was harmless. See Tenn. R. App. P. 36(a).

## H. Reenactment Photographs

The appellant contends that the trial court erred by allowing the State to introduce into evidence reenactment photographs of the crime. The State argues that the photographs were relevant to show the trajectory of the bullets. We conclude that the trial court properly admitted the photographs into evidence.

During Investigator Still's direct testimony, the State requested to show him photographs of a reenactment conducted by members of the Knoxville Police Department and the district attorney's office. The appellant objected, the State argued the photographs were relevant to show the trajectories of the bullets, and the trial court ruled the photographs were admissible. Investigator Still testified as to how the crime was reenacted. He said that a female, who was the same height as the victim, sat in the driver's seat of the Buick for the reenactment and that the purpose of the reenactment was to "[measure] down from the top of her shoulder to approximately where the wounds would be to try to show some trajectory and what could and could not happen." He explained that the female "victim" leaned to the right and that the police used a tape measure, trajectory rod, and long-barrel gun to show how the bullets could have entered her body from different angles. The appellant contends that the trial court erred by admitting the photographs into evidence because they do not depict a true and accurate portrayal of the shooting.

In State v. Underwood, 669 S.W.2d 700, 704 (Tenn. Crim. App. 1984), this court stated that an in-court reenactment may be admissible, especially when the defendant has the opportunity, as the appellant did in this case, to cross-examine the witnesses who conducted the demonstration. Furthermore,

> Evidence may be given of experiments, demonstrations, and tests made out of court and not in the presence of the jury upon the same principles which permit them to be conducted in the jury's presence. It is a matter peculiarly within the discretion of the court to decide the admissibility of such evidence in the light of all the surrounding facts and circumstances. The test for exclusion is whether the [demonstration] would confuse rather

than aid the jury.

State v. Robertson, 130 S.W.3d 842, 855 (Tenn. Crim. App. 2003). The decision regarding the admissibility of photographs also lies within the trial court's discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). In order to be admitted as evidence, a photograph must be relevant to an issue at trial. Tenn. R. Evid. 402; State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

The appellant cross-examined Investigator Still about the reenactment and its limitations. During Dr. Mileusnic-Polchan's testimony, the State showed her a reenactment photograph of the female "victim" leaning to the right, and the doctor stated that it was "consistent with what I see in the body." In our view, the reenactment and resulting photographs were relevant to show the victim's and the appellant's possible positions at the time of the shooting. Moreover, the reenactment and photographs aided the jury. Therefore, the trial court did not err by admitting the photographs into evidence.

## I. State's Cross-examination of Appellant

The appellant contends that the trial court erred by allowing the State to cross-examine him about his last name and dismissed charges. The State argues that its cross-examination was relevant to the appellant's credibility. We conclude that the appellant has waived any argument regarding the State's cross-examination about his name and that the trial court properly allowed cross-examination about the dismissed charges.

Before the appellant testified, the State reminded the trial court in a jury-out hearing that it had filed a pretrial motion pursuant to Tennessee Rule of Evidence 608 to cross-examine the appellant about his criminal record. Specifically, the State planned to question the appellant about a 2001 charge for passing a forged check and a 1998 charge for possessing a stolen vehicle. The State also asked to question the appellant about why he had signed his name as Travis Echols on a 1998 guilty plea to misdemeanor assault when his legal name was Travis Brabson. The defense objected, arguing that the charges had been dismissed, and, therefore, no factual basis existed for the inquiry. As to the name on the 1998 guilty plea, the defense argued that any reference to the assault was extremely prejudicial. The trial court ruled that the State could ask the appellant about the charges because "there was a factual basis for the accusation and that's all Rule 608 requires." However, the court held that the State could not ask the appellant about his name in

conjunction with the assault. The following exchange then occurred:

> [The State]: But . . . I can ask him about what names he's used since his last name was changed, I take it. I mean, that's not anything subject to notice. That's fair cross-examination I would think.

> THE COURT: Well, clearly, the fact that he has two names has come out over and over. You can ask him about it. You can ask him what his practice is with regard to using two names.

As to the appellant's claim regarding cross-examination about his last name, the defense argued that reference to the guilty plea for assault was prejudicial. The trial court sustained the objection. The State then requested to ask the appellant about his general use of two different last names, and counsel did not object. Counsel also did not object during the State's cross-examination of the appellant about his last names. Therefore, this issue has been waived. See Tenn. R. App. P. 36(a).

Regarding the charges for passing a forged check and possessing a stolen vehicle, the appellant argued at trial that cross-examination was improper because the charges were dismissed, and, therefore, no factual basis existed for the State's inquiry. Tennessee Rule of Evidence 608(b) provides that

> [s]pecific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness . . ., be inquired into on cross-examination.

Before a witness can be questioned, the trial court, upon request, must hold a hearing to determine whether "the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b)(1). Also, if the witness is the defendant, the trial court must determine whether "the conduct's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 608(b)(3).

As this court has stated, "A prior instance of conduct amounting to a theft would be admissible on the question of an individual's credibility under Tennessee Rule of Evidence 608(b) even if no conviction resulted from the conduct." State v. Mario Gray, No.

-28-

M2006-00398-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 990, at *24 (Nashville, Dec. 17, 2007). Therefore, the mere fact that the charges were dismissed does not eliminate the existence of a reasonable, factual basis for the inquiry.

We note that on appeal, the appellant also argues that the charges were not probative of his truthfulness and that their probative value on credibility did not outweigh their unfair prejudicial effect. The trial court did not state whether the charges had probative value as required by Rule 608(b)(1). However, passing a forged check and possession of a stolen vehicle would be probative of a defendant's truthfulness. See State v. Wendell Ray Williams, No. M2001-02296-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 312, at *22 Nashville, Apr. 4, 2003) (prior convictions for passing forged documents relevant to credibility); State v. Odell Smith, 02C01-9707-CR-00259, 1998 Tenn. Crim. App. LEXIS 808, at **4-5 (Jackson, Aug. 23, 2005) (conviction for receiving stolen property relevant to credibility) (citing State v. Robert Davis, No. 02C01-9407-CC-00148, 1995 Tenn. Crim. App. LEXIS 711 (Jackson, Aug. 23, 1995)). Moreover, given that the charges were dissimilar to the crime in this case, their probative value outweighs their unfair prejudicial effect on substantive issues. The appellant is not entitled to relief.

## J. Jailhouse Telephone Call

Next, the appellant contends that during the State's cross-examination of him, the trial court improperly allowed the State to play a recording of a jailhouse telephone call he made to his mother. He contends that the telephone call was irrelevant and portrayed him in an "unflattering manner" because his mother used profanities throughout their conversation. However, at trial, the appellant objected on the basis that the State could not play the recording without first asking the appellant about his statement. The appellant did not argue that the recording was irrelevant or prejudicial. See Tenn. R. App. P. 36(a). Moreover, the recording is not in the appellate record. See Tenn. R. App. P. 24(a). Therefore, this issue has been waived.

## K. Brady Violations

The appellant contends that the State violated Brady v. Maryland, 373 U.S. 83, 87 (1963), by failing to provide the defense with (1) names of people who heard gunshots on the day of the shooting; (2) a recording of James Blackwell's statement to Investigator Still; and (3) Patricia Hickman's polygraph results. The State argues that the appellant has failed to establish a Brady violation. We agree with the State.

In Brady, 373 U.S. at 87, the United States Supreme Court held that the State has a constitutional duty to furnish the defendant with exculpatory evidence pertaining to the

defendant's guilt or innocence or to the potential punishment faced by the defendant. Specifically, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. The State's duty to disclose exculpatory evidence extends to evidence which may be used by the accused for impeachment purposes. Giglio v. United States, 405 U.S. 150, 154-55 (1972).

In order to prove that a Brady violation exists, a defendant must show that (1) he requested the information (unless the evidence is obviously exculpatory, in which case the State is obligated to release such evidence regardless of whether or not it was requested); (2) the State suppressed the information; (3) the information was favorable to the defendant; and (4) the information was material. State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995). The appellant bears the burden of proving a Brady violation by a preponderance of the evidence. Id.

Factors three and four are at issue in this case. Regarding the third factor, evidence is favorable if it "'provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.'" Johnson v. State, 38 S.W.3d 52, 56-57 (Tenn. 2001) (quoting Commonwealth v. Ellison, 379 N.E.2d 560, 571 (Mass. 1978)). Regarding the fourth factor, "Evidence is deemed to be material when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Johnson, 38 S.W.3d at 58 (quoting Edgin, 902 S.W.2d at 390). The United States Supreme Court explained that the touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." Kyles v. Whitley, 514 U.S. 419, 434 (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)). In other words, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435.

Regarding the names of people who heard gunshots, Investigator Still testified on cross-examination that he wrote in his notes some of the names of witnesses who heard gunshots on the day of the shooting. However, he also said that he did not talk to any of those witnesses to ask them about the pattern of the shots. Therefore, nothing indicates that this information was favorable or material to the defense.

As to Blackwell's statement, the appellant learned during Blackwell's testimony that Blackwell had given an audio-recorded statement to Investigator Still. The appellant requested the recording, the State gave the recording to the defense, and the trial court gave defense counsel thirty minutes to listen to it. In the recorded statement, Blackwell claimed that the appellant told him that the appellant shot the victim in self-defense. Although this information was favorable, Blackwell had just testified about the appellant's self-defense claim, and the appellant had the opportunity to question Blackwell about his testimony and about Blackwell's statement to Investigator Still. Therefore, the appellant has failed to show that the statement was material to the defense.

Regarding Patricia Hickman's polygraph results, Investigator Still testified that he investigated Hickman, she came to the police department for an interview, and he was able to eliminate her as a suspect. The defense requested a bench conference, informed the court that Hickman had taken a polygraph test, and requested a copy of the test results. The trial court said, "I'll have to think about that. I don't think it comes in." On cross-examination, Investigator Still acknowledged that Hickman had taken a polygraph, and the defense asked him, "And, in fact, she flunked that polygraph test[?]" The State objected, and the trial court sustained the objection. Nothing indicates that Hickman had anything to do with the victim's death or had any information about the shooting, and Investigator Still said he eliminated her as a suspect. The appellant has failed to show the polygraph results were favorable or material to the defense.

## L. Cross-examination About Hickman

The appellant contends that the trial court erred by refusing to allow him to cross-examine Investigator Still about how he was able to eliminate Hickman as a suspect. We find no merit to this claim.

The defense asked the investigator on cross-examination if Hickman had taken and failed a polygraph test, and the State objected. The defense requested a bench conference and asked that it be allowed to question the investigator about the polygraph because the investigator "brought up the fact that he says he's cleared this person." The trial court refused stating, "He could have cleared her any number of ways. He didn't bring up [the] polygraph, you did. I'm sustaining the objection."

The trial court would not allow the appellant to question Hickman about the polygraph but noted that other factors could have played into the investigator's decision to clear Hickman as a suspect. The defense could have continued questioning Investigator Still about those other factors but chose not to do so. See Tenn. R. App. P. 36(a). Therefore, he is not entitled to relief.

## M.  Pending Charges Against Hammontree

The appellant contends that the trial court erred by preventing him from informing the jury that Hammontree's pending charges had been dismissed.  The State argues that the trial court correctly refused to allow the appellant to inform the jury about the dismissed charges because the appellant has failed to show the charges were dismissed in return for Hammontree's testimony.  We agree with the State.

On the second day of trial, Hammontree testified on cross-examination that charges for theft and forgery were pending against him.  On redirect examination, Hammontree testified that he was charged with those crimes in October 2006, which was after he came forward with information about the victim's shooting, and that the State had not promised him anything in return for his testimony.  On the fourth day of trial, the defense informed the trial court that "we understand that the charges against Mr. Hammontree were nolle prossed" and that "it's appropriate to bring that to the jury's attention since he was asked about pending charges."  The State objected, saying, "There's no proof that his charges were dismissed because he testified the way the State wanted him to.  That's what the argument is.  Absolutely none and it's insulting[.]"  The defense did not ask to recall Hammontree to the stand but asked the court to take judicial notice of the nolle prossed charges.  The trial court denied the appellant's request.

As this court has stated,

> It is a fundamental principle of law that an accused has the right to cross-examine prosecution witnesses to impeach the credibility or establish the motive or prejudice of the witness.  This includes the right to cross-examine a prosecution witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness.

State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993).  When the State enters into an agreement with a witness in exchange for the witness' cooperation, basic fairness dictates that all of the compromise is open for scrutiny and inquiry.  State v. Ingram, 638 S.W.2d 428, 430 (Tenn. Crim. App. 1982).

In this case, Hammontree testified on redirect examination that he had not been promised anything in exchange for his testimony.  Moreover, after the defense learned the charges had been nolle prossed, the State adamantly denied that the charges had been nolle prossed in exchange for Hammontree's testimony.  The appellant has not presented any proof that the State lied about entering into a deal with Hammontree, and the appellant did not

make an offer of proof by questioning Hammontree about the nolle prossed charges. Therefore, we cannot say the trial court erred by refusing to allow the appellant to inform the jury that Hammontree's charges were nolle prossed.

## N. Defense Investigator

The appellant contends that the trial court erred by making his investigator leave the courtroom during a portion of the trial when the investigator was not a witness. The State argues that the trial court did not abuse its discretion by removing the investigator from the courtroom. We conclude that the appellant is not entitled to relief.

After the first witness testified, the State requested that the appellant's investigator be removed from the courtroom, stating as follows:

> Your Honor, the State is moving to have Mr. Cohan, the investigator for Mr. Echols, placed out under the rule. The State asked for the rule, [defense counsel] asked for the rule at the start of this trial. And the State has reason to believe that Mr. Cohan has interviewed state witnesses.
>
> Now, to the extent that that may give rise to prior inconsistent statements, he's obviously a witness there. But the State also has reason to believe after talking with some witnesses that Mr. Cohan may have attempted to influence one or more witnesses to appear or not appear in this proceeding.
>
> So I think it's very possible he may become a witness in some form or fashion for one side or the other. We ask he be removed under the rule.

The defense objected, stating that "[w]e have not intended to call Mr. Cohan" and that "we have Mr. Cohan available for preparation in cross-examination of these witnesses." The trial court asked Cohan to wait outside the courtroom "[i]n an abundance of caution."

Later during the trial, the following exchange occurred:

> [Defense counsel]: You have made it difficult for me to try this case because you have told my investigator that there is no good faith basis to even be removed from this courtroom and try this. And yet the State's witnesses get to stay in and out,

whether or not they may be recalled or not. What's [the State's] good faith basis that Mr. Cohan is going to be called as a witness in this case?

[The State]: I've already stated that.

THE COURT: Yeah.

[Defense counsel]: He hasn't stated anything --

THE COURT: Yes, [the State] has said he has evidence that your investigator may have tried to intimidate one of the State's witnesses and that he may call him to the stand and inquire into that. That's his basis for telling the Court that he may call your investigator to the stand.

Subsequently, the defense raised the issue again, stating,

Mr. Cohan is an integral part of my trial preparation. Your Honor has placed him under the rule, the rule for purposes that are essential to trial preparation, I would like to be able to talk and speak and use Mr. Cohan as an investigator as I would under normal situations, and sometimes that involves talking to my client. The Court has restricted me from using Mr. Cohan in that capacity and we would ask relief from that part of the rule. We still haven't seen anything that has to do with any rebuttal that Mr. Cohan may have in this case.

The investigator remained outside the courtroom.

After Rebecca Carpenter testified, the defense argued for the third time that Cohan was essential to trial preparation and asked that he be relieved from the rule. The State said, "Your Honor, my concern was with this last witness and the issue didn't come up." The trial court allowed Cohan to return to the courtroom.

Rule 615, Tennessee Rules of Evidence, provides, in pertinent part,

At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. . . . This rule does not authorize exclusion

-34-

of (1) a party who is a natural person, or (2) a person designated by counsel for a party that is not a natural person, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause. This rule does not forbid testimony of a witness called at the rebuttal stage of a hearing if, in the court's discretion, counsel is genuinely surprised and demonstrates a need for rebuttal testimony from an unsequestered witness.

"Under subsection (3) . . ., the court has discretion to allow a witness to remain in the courtroom or even at counsel table if the witness's presence is 'essential to the presentation of the party's cause.'" Tenn. R. Evid. 615, Advisory Comm'n Comments. "The purpose of the rule is to prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992). "'The party seeking to avoid sequestration bears the burden of proving that a Rule 615 exemption applies.'" Frankie Donald Releford v. State, No. E2004-00695-CCA-R3-PC, 2005 Tenn. Crim. App. LEXIS 281, at *9 (Knoxville, Mar. 28, 2005) (quoting El Paso Pitts v. State, No. W2001-01563-CCA-R3-PC, 2002 Tenn. Crim. App. LEXIS 353, at *9 (Jackson, Apr. 17, 2002)). A defendant is not entitled to relief for a Rule 615 violation unless the defendant can show prejudice. See id. at 424.

The State indicated that it may call the investigator as a witness. Moreover, although defense counsel stated that he did not intend for the investigator to testify, counsel also did not say definitively that the investigator would not do so. Therefore, the investigator was subject to sequestration unless the appellant could show he was exempt as an essential person. See State v. Billy Joe Henderson, No. 03C01-9804-CR-00139, 1999 Tenn. Crim. App. LEXIS 614, at **37-39 (Knoxville, June 18, 1999).

Although the defense argued repeatedly that Cohan was essential to the appellant's case, the trial court seemed concerned only with the fact that Cohan may testify during the trial. The trial court did not address whether Cohan was essential to the presentation of the appellant's cause. We note that a defense investigator can qualify as "essential" under the third exemption of Rule 615. See United States v. Ortiz, 10 F. Supp. 2d 1058 (N.D. Iowa 1998) (court-appointed defense investigator exempt as essential under Rule 615); see generally Henderson, No. 03C01-9804-CR-00139, 1999 Tenn. Crim. App. LEXIS 614, at **38-39 (panel of this court unable to determine whether defense investigator exempt as essential because defendant failed to provide adequate record on appeal). In addition, "since counsel, not the judge, is intimately familiar with the theories and proof to be used in the case, the court should be hesitant to second guess counsel's assessment of a witness's role and importance." Cohen, Tennessee Law of Evidence § 6.15[6].

In any event, the appellant alleges that the Rule 615 violation "substantially prejudiced" his trial preparation and cross-examination of witnesses. However, he has not explained how not having his investigator in the courtroom affected his trial preparation or cross-examination of witnesses or provided any examples of prejudice. Therefore, he is not entitled to relief.

O. Felony Murder Instruction

The appellant contends that the trial court erred by instructing the jury that felony murder committed during the perpetration of robbery includes the attempt to commit robbery when the indictment did not charge attempt. The State argues that the trial court properly instructed the jury because the indictment specifically referred to the felony murder statute and the trial court used the pattern instruction for felony murder. We agree with the State.

The indictment charged the appellant as follows:

> The Grand Jurors for the State of Tennessee, upon their oaths, present that TRAVIS KINTE ECHOLS, ALIAS, heretofore, to-wit: On or about the 18th day of June, 2005, in the State and County aforesaid, did unlawfully kill Robert Steely during the perpetration of Robbery, in violation of T.C.A. 39-13-202, and against the peace and dignity of the State of Tennessee.

The appellant claimed that because the indictment did not allege the murder was committed during the attempt to commit robbery, the trial court should remove the attempt language from the jury instruction. The State argued that the trial court should give the pattern instruction for felony murder. The trial court agreed with the State and instructed the jury, in pertinent part, that in order to find the appellant guilty of felony murder, the jury had to find that "the killing was committed in the perpetration of or the attempt to perpetrate the alleged robbery."

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). "We must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). A charge resulting in prejudicial error is one that fails to fairly submit the legal issues to the jury or misleads the jury about the applicable law. State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

-36-

The Sixth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Tennessee Constitution afford an accused the right to be informed of the nature and cause of the accusation against him or her. See State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). Generally, an indictment is valid if the information contained therein provides sufficient information "(1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). With the decline of common law offenses and the advent of statutory offenses, strict pleading requirements are no longer necessary. Id. at 727-28. "Hill and its progeny leave little doubt that indictments which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000). Moreover, "specific reference to a statute within the indictment may be sufficient to place the accused on notice of the charged offense." State v. Sledge, 15 S.W.3d 93, 95 (Tenn. 2000).

We conclude that the indictment gave the appellant sufficient notice of the charged offense, including felony murder committed during the perpetration of attempted robbery. The indictment specifically referred to felony murder and the statute allegedly violated, Tennessee Code Annotated section 39-13-202. Tennessee Code Annotated section 39-13-202(a)(2) defines felony murder, in relevant part, as the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.] The indictment informed the appellant as to nature of the charges against him so as to enable the entry of proper judgments and to protect against double jeopardy. See State v. Lonnie M. Maclin, No. W2004-00468-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 1120, at *10 (Jackson, Oct. 17, 2005). Moreover, the trial court used Tennessee pattern instruction 7.03, the instruction for felony murder. According to a footnote for the instruction, "[t]he trial judge may wish to charge criminal attempt in appropriate fact situations." Tennessee Pattern Jury Instruction 7.03 n.4--Criminal (11th ed. 2007). We hold that the trial court properly instructed the jury.

P. Sufficiency of the Evidence

Finally, the appellant contends that the evidence is insufficient to support the conviction because the evidence shows he killed the victim in self-defense and did not kill the victim during the perpetration of robbery. The State argues that the evidence is sufficient. We agree with the State.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact

could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

As stated in the previous section, felony murder is defined, in relevant part, as the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.] Tenn. Code Ann. § 39-13-202(a)(2). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear. Tenn. Code Ann. § 39-13-401(a).

Self-defense is a fact question for the jury. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). At the time of the crime, Tennessee Code Annotated section 39-11-611(a) (2005) provided that the use of force may be justified when a person has a reasonable belief that there is an imminent danger of death or serious bodily injury.

The evidence is more than sufficient to support the conviction. George Hammontree testified that he heard someone say, "Give it up. Give it up." He looked up and saw the appellant pointing a rifle at the victim, who had his hands up. Hammontree "hit the floor" and heard four shots. He said that he was familiar with guns, that the first three shots were fired from a .22 caliber automatic, and that the final shot came from a larger caliber weapon. The evidence established that the victim fired one shot from his .38 caliber revolver. Rebecca Carpenter, who had just bought cocaine from the appellant and was standing next to the victim's car, heard a gunshot. When she looked up, she saw the appellant holding a long gun. She never saw the victim with a weapon. Immediately after the shooting, Carpenter grabbed her purse off the front seat and ran. She said the victim's wallet was still in his pocket at that time. However, the police never recovered the wallet. Hammontree and Carpenter identified the appellant as the shooter from photograph arrays. James Blackwell testified that the appellant told him the appellant pointed a .22 caliber rifle at the victim and demanded the victim's money. The appellant also told Blackwell that he shot the victim and took the victim's money, almost ten thousand dollars, out of the victim's pocket. Although the appellant told Blackwell that the victim shot at him first, the testimony of Hammontree and Carpenter, eyewitnesses to the crime, established that the appellant shot the victim first. The evidence was such that a reasonable jury could have concluded beyond a reasonable doubt that the appellant demanded money from the victim, shot the victim three times, was

then shot at by the mortally-wounded victim, and took the victim's wallet. Therefore, the evidence is sufficient to show that the appellant did not shoot the victim in self-defense and that the appellant is guilty of first degree murder committed during the perpetration of robbery.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE